UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
TEDDY BLAIR,

               Plaintiff,

      -against-

THE CITY OF NEW YORK, DETECTIVE EDWARD
HENDRICKSON, Individually and in his Official Capacity
DETECTIVE CHARLES SCHMIDT, Individually and in
his Official Capacity, and P.O.s JOHN and JANE DOE
#1-10, Individually and in their Official Capacities, (the names
John and Jane Doe being fictitious, as the true names are
presently unknown),

               Defendants.
------------------------------------------------------------------------x

**MEMORANDUM and ORDER**

03 CV 1485 (SLT) (CLP)

**TOWNES, United States District Judge:[1]**

     Plaintiff, Teddy Blair, brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 and

state law against the City of New York, New York City Police Department Detectives Edward

Hendrickson and Charles Schmidt, and unnamed police officers (collectively, the "Defendants"),

alleging violations of his civil rights.  Defendants now move for summary judgment pursuant to

Fed. R. Civ. P. 56.  For the reasons set forth below, Defendants' motion is granted in part and

denied in part.

**BACKGROUND**

     Except as otherwise indicated, the following facts are not in dispute.  Joy Tucker ("Joy")[2]

lived with her mother in an apartment on the 13th floor of 163-15 130th Street, one of the twenty

---

     [1]The Court gratefully acknowledges the assistance of a student intern, Polina
Pecherskaya of Cardozo Law School, in the preparation of this Memorandum and Order.

     [2] The name of the deceased is spelled differently in the Complaint, in Defendant's
moving papers and in Plaintiff's moving papers. This Court will use this spelling rather than
"Joi."

apartment buildings which comprise Rochdale Village, a development in Queens, New York. Declaration of Rose W. Weber ("Weber's"), Ex. A, at 57; Declaration of Liora Jacobi ("Jacobi's"), Ex. B, at 47-48; Plaintiff's Statement pursuant to Rule 56.1(b) ("Pl.'s 56.1 Statement") at ¶ 3; Defendants' Statement pursuant to Rule 56.1 ("Defs.' 56.1 Statement") at ¶ 3. On September 3, 1998, at around 10:00 p.m., Joy and a visiting friend, Shateka Washington ("Shateka")[3], went to the lobby of Joy's building.  Pl.'s 56.1 Statement at ¶ 5; Defs.' 56.1 Statement at ¶ 5.  There, at around 10:04 p.m., Joy was shot.  Jacobi's Ex. C.  Fatally injured, Joy left the lobby, waving her hands and gasping for air, and walked towards a security booth manned by Rochdale Village security guards Jesus Rosario and Barrington Dwyer.  Pl.'s 56.1 Statement at ¶¶ 25, 54; Defs.' 56.1 Statement at ¶¶ 25, 54.  Joy was subsequently removed by ambulance to Mary Immaculate Hospital.  Jacobi's Ex. B, at 198; Jacobi's Ex. B, at 49-51.

Defendant Schmidt, a detective at the 113th Precinct, was assigned to be the lead detective on the case.  Pl.'s 56.1 Statement at ¶ 28; Defs.' 56.1 Statement at ¶ 28.  He went to the scene shortly after the incident and was told, by an unidentified source, that a friend of the victim, Shateka Washington, witnessed the shooting.  Pl.'s 56.1 Statement ¶ 30; Defs.' 56.1 Statement at ¶ 30.  Detective Schmidt told Shateka that he wanted to interview her and placed her in the back of his unmarked car.  Pl.'s 56.1 Statement at ¶ 31, Defs.' 56.1 Statement at ¶ 31; Weber's Ex. B, at 197.

The parties disagree as to what happened next.  Detective Schmidt testified that Shateka left the car when he went to tell his partner that he was returning to the precinct to interview a

---

[3]Shateka Washington's name is spelled differently in Plaintiff's 56.1 Statement, the Complaint Report and Defendant's 56.1 Statement. This Court will use this spelling, used in Plaintiff's 56.1 Statement and the Complaint Report, rather than "Shtaeeka."

witness.  Defs.' 56.1 Statement at ¶ 32;  Jacobi's Ex. B, at 197-198; Jacobi's Ex. F, at 30.

Shateka, on the other hand, testified that she spoke to two detectives for about 20 minutes in the

car, and that she did not leave until they said she could.  Pl.'s 56.1 Statement at ¶ 32; Weber's

Ex. A, at 168.  She recalled telling the detectives that she had been visiting Joy that evening, and

had gone to the lobby of Joy's building to await her boyfriend, plaintiff Teddy Blair, who had

agreed to bring her carfare.  Blair delivered the money but, according to Shateka, then left the

lobby.  Shateka and Joy remained in the lobby for about ten minutes thereafter, conversing,

before three men entered the building.  Shateka did not recognize the three men, and could give

only a general description of them, saying that all were brown-skinned, that two were dark and

that they were wearing hats and coats.  Weber's Ex. A, at 138-153.

According to Shateka, one of the men approached Joy and said, "Let me talk to you."  He

and Joy then started arguing. Shortly thereafter, the man pulled something that appeared to be a

gun from his waistband, prompting Shateka to run outside. *Id.*

Detective Schmidt next attempted to talk to Joy at Mary Immaculate Hospital.  Pl.'s 56.1

Statement at ¶ 33; Defs.' 56.1 Statement at ¶ 33.  He arrived at the hospital to find Joy,

unconscious and unresponsive, being treated in the trauma room by numerous physicians.  She

never regained consciousness and expired shortly thereafter, before she could be questioned.

Jacobi's Ex. B, at 198.

Later that night, Detective Schmidt interviewed Rochdale security guard Jesus Rosario,

who said that he saw Joy and Shateka in the lobby with a group of about six men shortly before

the shooting.  He saw the group of men leave the building, then saw another man enter the lobby.

That man began arguing with Joy and slapped her in the face.  Rosario and his partner, Dwyer,

then ran towards the building, but heard three shots before they reached the lobby. Although

Rosario did not see the shooting itself, he recalled seeing the man flee up the stairs inside the

building and seeing Shateka and Joy leave the lobby. Joy ran towards him and then collapsed,

falling to the ground. He tried to get some information from the victim but did not succeed.

Jacobi's Ex. E.

Detective Wilkowski interviewed Dwyer at 2:00 a.m. on September 4, 1998. Dwyer's

account was identical to Rosario's except in the following respects. Dwyer specified that the

man who fought with the victim was one of the men who had exited the building moments

earlier. Dwyer also stated that a second girl had attempted to break up the argument between the

man and the victim. Dwyer said that he asked Joy who shot her and he thought, but was not one

hundred percent sure, that she said it was "Tony." Jacobi's Ex. E.

While Detective Wilkowski was interviewing Dwyer, Shateka's mother brought Shateka

to the precinct. Jacobi's Ex. F, at 51, 57. Detective Schmidt was busy and asked Detective

Panchin to interview Shateka. *Id.*, at 51, 56. Since neither party produced a DD-5 report relating

to this interview, it is unclear precisely what Shateka told the detective. According to Detective

Schmidt, Detective Panchin told him that Shateka was "definitely sedated," definitely did not

want to talk to him, and provided no useful information. *Id.*, at 56. Shateka recalled being

medicated and sleepy, but claimed that she told a detective that Joy told her she had been

threatened by one Fox and that the police should "look for him first" if anything ever happened

to her. Weber's Ex. A, at 96-97.

On the afternoon of October 4, 1998, police were alerted by someone who identified

himself as "Phil" that there was another witness to the shooting – Tequan Henry. Jacobi's Ex. H.

Phil informed the police that Henry frequented her grandmother's apartment, which was in the same building in which Joy had been shot. Jacobi's Ex. H. Defendant Schmidt contacted Henry's grandmother and arranged to meet with Henry and her grandmother at the U.S.A. Diner on Merrick Boulevard in Rosedale, New York.

At this October 6, 1998 meeting, Henry told Detective Schmidt that on the night of September 3, 1998, at about 10:00 p.m., while passing through the lobby of her grandmother's building, she witnessed an argument involving Plaintiff, whom she knew as "Polite," Joy and Shateka. She told detectives that she knew "Polite" to be the boyfriend of Shateka, whom she knew from high school. Jacobi's Ex. G, at 8. Henry then saw the argument escalate into a physical fight between Polite and Joy. As she walked out the front door of the lobby, Henry heard three shots behind her. She looked back and saw Shateka and Joy running out the front door towards the security guard booth, but did not see Polite. Supplemental Declaration of Liora Jacobi to Defendants' Reply Memo of Law ("Jacobi's Supp."), Ex. F, at 64-67.

At about 6:25 p.m. October 6, 1998, Detectives Schmidt and O'Connor met with Henry and asked her to view a photo array. Henry viewed the array and identified a photograph of Plaintiff Blair as the man she knew as "Polite." Jacobi's Ex. H.

Thereafter, the police made efforts to locate Blair. On October 8, 1998, they visited his last known address – 145-11 167th St. – where he had been living in the basement as the guest of the owner, Herbert Spaulding. Pl.'s 56.1 Statement at ¶¶ 68, 69; Defs.' 56.1 Statement at ¶¶ 68, 69; Jacobi's Ex. K, at 9-10. Spaulding permitted the police to search his basement, where the police uncovered photographs of Blair and others holding firearms. *Id.*, at 5-7; Pl.'s 56.1 Statement at ¶ 73, Defs.' 56.1 Statement at ¶ 73; Jacobi's Ex. M. Spaulding told the police that

he had not seen Blair for several days. Jacobi's Ex. L, at 7-8. Blair corroborated this, testifying at his deposition that he never returned to 145-11 167th St. after the shooting because he knew that he would be arrested there. Jacobi's Ex. I, at 209.

One or two months after the shooting, the police went to Shateka's home looking for Blair. Jacobi's Supp. Ex. D, at 193. Shateka explained to the police that Blair was not there and allowed them to search the apartment. *Id.*, at 193-14. Shateka, however, did not tell the police where Blair was staying even though she was in contact with him and knew that he was staying with a friend, Anderson, in Far Rockaway. *Id.*, at 195.

The police finally located Blair on December 9, 1998. Pl.'s 56.1 Statement at ¶ 96; Defs.' 56.1 Statement at ¶ 96; Jacobi's Ex. P. On the morning of December 9, 1998, the police raided an apartment occupied by one Jimmy Rhone, his mother and brother. Jacobi's Ex. N, at 48- 49, 97. Rhone was suspected of drug-related activity and known to be one of Blair's friends. The police arrested Rhone, his mother and brother after finding cocaine in the apartment. *Id.*, at 21, 49-51. Sometime that morning, Rhone informed the police that Blair was staying with Anderson at 7400 Shore Parkway in Far Rockaway. *Id.*, at 61-62. The police arrested Blair at that address at 12:30 p.m. Jacobi's Ex. P.

Sometime that afternoon, after Blair was arrested, Rhone gave the police a statement in which he stated that he and Blair had a telephone conversation on September 10 or 11, 1998, in which Blair, whom he knew as "Polite," admitted to killing Joy after an argument. Rhone's Statement (included in Jacobi's Ex. N). Rhone expressly denied that the officers had used threats to coerce him into making this statement. *Id.*, Rhone Deposition at 87-89. Rather, by Rhone's own account, Rhone agreed to cooperate with the police after they informed him that

his mother had been hospitalized and told him that he would be released if he gave a statement. *Id.*, at 79, 82 & 87, 89.  The police did not tell him what to tell them, but encouraged him to give them "something good."  *Id.*, at 110.  Although Rhone alleged at his deposition that the statement he gave the police was not true, he also testified unequivocally that the officers did not know that the statement was untrue and that it was consistent with information that both Rhone and the officers had heard "on the streets."  *Id.*, at 70,79, 109-122.  Blair himself also testified that he did not think that detectives knew that Rhone's statement was false.  Jacobi's Ex. I, at 297.

At 10:35 p.m. on December 9, 1998, the police conducted a lineup at the 113th Precinct. *Id.*, at 248-249; Jacobi's Ex. R; Jacobi's Ex. S.  Henry, the sole witness to view the lineup, identified Blair as the man she knew as "Polite."  Jacobi's Ex. B, at 82-83.  Henry told the police that he was the man she had seen arguing with Joy in the lobby shortly before the shooting.  *Id.*, at 83-84.

Blair testified at his deposition that, following the lineup, officers at the 113th Precinct attempted to physically coerce him into admitting his guilt.  According to Blair, his left hand was handcuffed to a pole, and he was assaulted on five separate occasions between the time the lineup ended and 2:00 a.m. on December 10, 1998.  Blair alleges that on three of these occasions, defendant Hendrickson entered the interview room alone and struck him with fists and a telephone book in the ribs, back, arms and stomach. On two other occasions, Detective Hendrickson was accompanied by another, skinny detective, who also struck Plaintiff with his fists and a telephone book.  Jacobi's Ex. I, at 259-271.  Blair alleges that he complained to the jail medical personnel, but there is no evidence in the jail's medical records of his complaints. Weber's Ex. C, at 272-273, 279-281; Jacobi's Supp. Ex. A.

Plaintiff was charged with two counts of murder in the second degree (on both intentional murder and depraved indifference theories) and with related weapon offenses. Jacobi's Ex. P; Jacobi's Ex. X. In February 1999, he was indicted on these same charges. Jacobi's Ex. U. At his deposition, Blair speculated that Rhone testified at the Grand Jury in a manner consistent with his statement and that his testimony was critical, stating "I think that's what got me indicted." Jacobi's Ex. I, at 298. However, Blair admitted that he had never seen the Grand Jury minutes, and therefore did not "know for sure" what, if anything, Rhone told the Grand Jury. *Id.*

Blair remained in jail, awaiting trial, for almost three years. In November 2001, he went to trial in the Supreme Court of the State of New York, Queens County. Henry testified against him, but Rhone did not. *Id.*, at 298-299. Blair was acquitted on all charges. Complaint ¶ 20.

In March 2003, Plaintiff commenced this action against the City of New York, Detectives Schmidt and Hendrickson, and various Doe Defendants. Plaintiff's complaint alleges false arrest, malicious prosecution, malicious abuse of process, and the denial of his constitutional right to a fair trial. In addition, Plaintiff alleges that the Defendants used "excessive force." Plaintiff seeks compensatory damages and punitive damages, as well as costs and attorneys' fees.

Defendants now move for summary judgment. Defendants principally argue that Defendants had probable cause to arrest and to prosecute Plaintiff, but also contend that the facts do not make out a claim for malicious abuse of process and that there is no objective medical evidence to substantiate Plaintiff's excessive force claim. These arguments and Plaintiff's responses thereto are described in detail in the discussion below.

**DISCUSSION**

*Standard of Review*

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp v. Carett*, 477 U.S. 317, 322 (1986); *see also Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). Whether a fact is material depends on the substantive law of the claim and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that there is no genuine issue of fact. *Id.*, at 256. If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins.*, 472 F.3d 33, 41 (2d Cir. 2006). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citations omitted). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Nigara Mohawk Power Corp. v. Jones Chemical, Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Kerzer v. Kinely Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)).

*False Arrest*

In their motion for summary judgment, Defendants first seek summary judgment with respect to Plaintiff's false arrest claim on the ground that probable cause existed to arrest Plaintiff. A claim for false arrest under 42 U.S.C. § 1983 derives from an alleged violation of the

Fourth Amendment right to be free from unreasonable seizure absent probable cause. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). The elements of false arrest under §1983 are "'substantially the same' as the elements under New York law" and their analysis is identical. *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003) (quoting *Hugh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992)). In order to state a claim for false arrest under New York law, a plaintiff must prove that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (alteration in the original) (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975)).

Existence of probable cause is a complete defense to a false arrest action. *Singer*, 63 F.3d at 118. The existence of probable cause is determined by looking at the totality of the circumstances at the time of the arrest. *Illinois v. Gates*, 462 U.S. 213, 230-232 (1983). Probable cause exists where "the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer*, 63 F.3d at 119 (citing cases) (internal quotations omitted). "When information is received from ... an eyewitness, probable cause exists ... unless the circumstances raise doubt as to the person's veracity." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2000).

In this case, Detective Schmidt had probable cause to arrest Plaintiff after speaking to Henry on October 6, 1998. Henry told Detective Schmidt that just before the shooting, she saw "Polite" and Shateka, both of whom she knew, with Joy in the lobby of her grandmother's building. Henry further stated that she saw Polite and Joy physically fighting, then heard three gunshots as she was stepping out of the lobby. Henry then saw Joy run out of the building, but

did not see "Polite" exit the lobby. Henry positively identified Plaintiff as the man she knew as "Polite" by selecting his photograph from an array. Jacobi's Ex. G. Henry also identified Plaintiff at a lineup on December 9, 1998, telling police that he was the man she had seen arguing with Joy moments before the shooting. Jacobi's Ex. B, at 82-84.

Plaintiff argues that Henry's account was insufficient to provide probable cause because it was not corroborated. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Memo.") at 5. However, Henry's account was strikingly similar to the account given by Rosario and Dwyer. On the night of the shooting, each of these two guards independently told detectives that he saw a man and two women in the lobby. Each said that he saw the man and Joy fighting and that he heard three gunshots as he ran towards the lobby. Each said that he saw Joy running out of the building and saw the man run up an interior staircase. Although Rosario and Dwyer did not see the actual shooting, their accounts corroborated many details of Henry's account. Accordingly, Plaintiff's claim that Henry's account is uncorroborated is unsubstantiated.

Plaintiff also argues that a jury could find Henry's identification of Plaintiff inherently unreliable because she is a cocaine-using stripper. In support of his argument, Plaintiff principally relies on *Javanovic v. City of New York*, 2006 WL 2411541, *7 (S.D.N.Y. Aug. 17, 2006), a single-witness rape case. However, *Javanovic* is distinguishable. In *Javanovic*, unlike in our case, there were numerous reasons for a police officer to question the alleged victim's reliability. The victim's accounts to the officer were inconsistent. She waited four days before approaching the police or seeking medical attention. The medical and forensic evidence did not support her allegations. Additionally, the victim had a history of making false sexual accusations against men, of which the officer could have learned with some investigation.

In *Javanovic,* Judge Crotty held that the police did not have probable cause based solely on complainant's allegations that she had been sexually assaulted by Jovanovic. Judge Crotty stated:

> The fact that a victim provides the police with information of an alleged crime does not, without more, establish probable cause. Rather, the officer has a duty to assess the reliability of the victim and, if circumstances call into doubt the victim's veracity, to investigate the allegations and corroborate them.

*Jovanovic,* 2006 WL 2411541, *7 (2006). In this case, however, detectives had no reason to call Henry's reliability into question since her account was consistent with Rosario's and Dwyer's and the search of her name in criminal records returned negative results. Indeed, as *Oliviera v. Mayer*, 23 F.3d 642 (1994), a case on which Plaintiff himself relies, plainly states, "[i]nformation about criminal activity provided by a single complainant can establish probable cause when that information is sufficiently reliable and corroborated." *Id.*, at 647.

Although Shateeka's statements to the police may have been inconsistent with Henry's, detectives had reasons to call Shateka's reliability and veracity into question. Detectives knew that Shateka was Plaintiff's girlfriend at the time of the shooting. Moreover, Shateka's account was markedly different from the largely consistent accounts given by Henry, Rosario and Dwyer. Shateka testified that she told the police that there were three males in the lobby shortly before the shooting. Henry, Rosario and Dwyer all told the police that there was only one male. Shateka also testified that she told the police that she ran out of the lobby as soon as one of the men pulled something that appeared to be a gun from his waistband. However, neither Henry, Rosario nor Dwyer told the police that Shateka exited the lobby before Joy did. Henry told the police that she walked past Polite, Shateka and Joy on her way out of the lobby and heard gunshots after which she saw Joy run out. Rosario told the police that he saw an argument and

heard three shots, after which he saw Joy and Shateka exit the building. Dwyer told the police that he heard three shots and saw Joy come out of the lobby screaming.

Based on the foregoing, this Court concludes that there is no genuine issue with respect to whether the police had probable cause to arrest Plaintiff. Since the existence of probable cause is a complete defense to a false arrest claim, *see Singer*, 63 F.3d at 118, Defendants' motion to dismiss Plaintiff's false arrest claim is granted.

### *Malicious Prosecution*

Defendants next seek summary judgment with respect to the claim of malicious prosecution on the ground that there was probable cause to prosecute Plaintiff. In order to state an action for malicious prosecution, a plaintiff must prove four elements: (1) that the defendant initiated a criminal proceeding, (2) that the proceeding terminated favorably to the plaintiff, (3) that there was no probable cause for the criminal charge, and (4) that the defendant acted maliciously. *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004) (citing cases). "The absence of probable cause is, therefore, 'an essential element of a claim for malicious prosecution.'" *Perez v. City of New York*, No. 01-CV-5384 (SLT) (MDG), 2006 U.S. Dist. LEXIS 94211 at *30 (E.D.N.Y. Dec. 29, 2007) (quoting *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006)).

It is an established rule that a Grand Jury indictment creates a presumption of probable cause. *Rothstein*, 373 F.3d at 282-83 (quoting *Colon v. New York*, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455, 455 N.E.2d 1248, 1250 (1983)). The presumption may be overcome "only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Id.*, at 283

(quoting *Colon*, 60 N.Y.2d at 82-83). Thus, in order for a plaintiff to succeed in a malicious prosecution claim after having been indicted, "he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *McClellan*, 439 F.3d at 145 (quoting *Colon*, 60 N.Y.2d at 83).

"The burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially[.]'" *Rothstein*, 373 F.3d at 284 (alteration in the original) (quoting *Colon*, 60 N.Y.2d. at 82); *see also Savino v. City of New York*, 331 F.3d 63 (2d Cir. 2003). Without proof of what happened before the Grand Jury, a plaintiff's contention that his indictment was based on false testimony amounts to "rank speculation." *Id.*

In the present case, Plaintiff argues that the presumption of probable cause is rebutted because Defendants coerced Rhone into giving false testimony to the Grand Jury. Plaintiff's Memo. at 8. However, Plaintiff fails to adduce proof of the content of Rhone's Grand Jury testimony. Indeed, the only information in the record to suggest that Rhone ever testified before the Grand Jury comes from Rhone's deposition, where Rhone stated that "[b]y going in front of the Grand Jury and telling a statement that [the officers] would release [him]." Weber's Ex. B at 81- 82. However, this statement is only evidence of what the officers told Rhone, not what actually occurred. Although Plaintiff testified at his deposition that he thought Rhone testified before the Grand Jury in accordance with what he wrote in his statement, Plaintiff never saw the Grand Jury minutes and, therefore, did not know what, if anything, Rhone told the Grand Jury. Jacobi's Ex. I at 298. Without such knowledge of the Grand Jury proceedings, Plaintiff's

allegations that false testimony was presented to the Grand Jury amounts to rank speculation. *See Rothstein,* 373 F.3d at 284; *Perez*, 2006 U.S. Dist. LEXIS 94211 at *32.

Additionally, Plaintiff's bare allegations that police officers coerced Rhone into manufacturing evidence against Plaintiff are not sufficient to raise an inference that the indictment was obtained as a result of fraud or bad faith conduct. There is no evidence suggesting that the police suborned perjury or otherwise acted in bad faith, or that Rhone's testimony was procured by fraudulent means. By Rhone's own admission, none of the officers ever asked him to lie. His decision to give a statement against Blair was prompted by his desire to have the drug charges he was facing dropped so that he could see his sick mother, and was not a result of any coercion on the part of the officers. Rhone himself testified that the officers never asked him to give false testimony.

To be sure, courts have found that plaintiffs raised triable issues of fact as to the presumption of probable cause in some cases in which plaintiffs adduced no proof of Grand Jury proceedings. In those cases however, there was ample proof supporting the plaintiffs' versions of the facts. In *Boyd*, 336 F.3d at 77, for example, the Court determined that there was a sufficient triable question of fact to overcome the burden created by the Grand Jury indictment because, even though the police officers testified that the arrest occurred outside Plaintiff's residence, the plaintiff testified that he was arrested inside his apartment and the booking sheet itself suggested that the arrest occurred there. The *Boyd* Court found that these facts suggested a real possibility that the police lied in order to secure the indictment.

Similarly, in *Chimurenga v. The City of New York*, 45 F. Supp. 2d 337, 342-343 (S.D.N.Y. Apr. 12, 1999), there was ample evidence that the police planted contraband. The

court concluded that there was a triable dispute as to whether genuine probable cause existed or whether the individual defendants manufactured it.

In the present case, there is no such evidence to support Plaintiff's allegations. Plaintiff has failed to adduce sufficient evidence to overcome the presumption of probable cause created by the Grand Jury indictment. Defendants' motion to dismiss Plaintiff's malicious prosecution claim is, therefore, granted.

### *Malicious Abuse of Process*

Defendants also seek summary judgment with respect to Plaintiff's fourth cause of action, which alleges malicious abuse of process. Malicious abuse of process often is, but should not be, confused with malicious prosecution. The elements of malicious abuse of process are borrowed from state law. *Cook v. Shelton*, 41 F.3d 73, 79-80 (2d Cir. 1994). Under New York law, in order to maintain a claim for malicious abuse of process a plaintiff must show that defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Id.*, at 80; *see also Savino,* 331 F.3d at 76. "The crux of a malicious abuse of process claim is the collateral objective element." *Douglas v. City of New York*, 2009 U.S. Dist. LEXIS 8328 at *20 (S.D.N.Y. Feb. 5, 2009).

Defendants allege that Plaintiff cannot establish this crucial third element. In order to establish the collateral objective element "a plaintiff must prove not that defendant acted with an improper motive, but rather an improper purpose." *Id.*, at *20-21. In other words, in a case in which an arresting officer is alleged to have committed "malicious abuse of process," the

16

plaintiff "must claim that [the arresting officer] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Id. (*quoting *Savino,* 331 F.3d at 77); *see also Chamberlain v. Lishansky*, 970 F. Supp 118, 122 (N.D.N.Y. Jul. 28, 1997); *Stewart v. City of New York*, 2008 WL 1699797 at *9 (S.D.N.Y. Apr. 9, 2008).

This court agrees with Defendants that Plaintiff cannot establish the collateral objective element because there is no evidence in the record that officers sought to achieve a collateral objective beyond or in addition to an arrest of a homicide suspect. Indeed, Plaintiff's only argument in support of his claim is that officers acted with an improper motive – that is, to close the case with as little work as possible. This improper motive alone, without an improper purpose, will not support a malicious abuse of process claim.

Besides, there is no evidence to suggest that Defendants tried to close the homicide case with as little work as possible. As Plaintiff himself concedes, Defendants "conducted a thorough investigation." *See* Plaintiff's Memo. at 6. Moreover, in the deposition testimony that Plaintiff himself cites, Detective Schmidt states that, although Henry's account led officers to consider Blair as the strongest suspect, "[he] wasn't counting out anyone else," and continued his investigation. Plaintiff's Memo. at 13; Weber's Ex. D at 72-73. Likewise, Detective Hendrickson testified that police continued their investigation even during the period in which they were actively searching for Plaintiff. *See* Weber's Ex. E. Since Plaintiff fails to point to any evidence that gives rise to an inference of an illegitimate collateral objective on the part of the Defendants, Defendants' motion to dismiss Plaintiff's abuse of process claim is granted.

***Excessive Force***

Defendants also seek to dismiss Plaintiff's excessive force claims, arguing that the force used was minimal and that Plaintiff cannot produce objective evidence to show excessive force. Claims for excessive force used by police officers "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 US 386, 395 (1989). "Determining whether the force used ... was 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.,* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "To succeed on a Fourth Amendment excessive force claim, a plaintiff must show that the amount of force used was 'objectively unreasonable.'" *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d. Cir 1996) (citing *Finnegan v. Fountain*, 915 F.2d 817, 821, 823 (2d Cir. 1990)).

In this case, Defendants argue that the force used during and following the arrest was *de minimus* and that medical evidence is necessary to support Plaintiff's excessive force claims. This Court does not agree. With respect to the first argument, Plaintiff testified that after handcuffing him following his arrest, Detective Hendrickson grabbed the back of Plaintiff's shirt and slammed him back and forth from wall to wall several times until Plaintiff passed out. Weber's Ex. C at 230, 233. *See Pierre- Antoine v. City of New York*, No. 04 Civ. 6987 (GEL), 2006 U.S. Dist. LEXIS 28963 at *12-13 (S.D.N.Y. May 9, 2006) (noting that it is much more difficult to show that force used was necessary to affect the arrest when the suspect was handcuffed). Plaintiff further testified that he was assaulted on five separate occasions while

18

handcuffed to a pole at the precinct on the night of his arrest. Specifically, Plaintiff testified that on three occasions Detective Hendrickson struck him with telephone books and his fists in the ribs, back, arms and stomach and, that on two occasions another detective struck him with fists and telephone books. In light of Plaintiff's testimony, the Court cannot find that the force used was reasonable or *de minimus*.

With respect to the second argument, the lack of medical evidence is not fatal to Plaintiff's excessive force claim. This case is similar to *Robinson v. Via,* 821 F.2d 913, 923-924 (2d Cir. 1987), in which a plaintiff testified that she suffered bruising at the hands of the police, but offered no medical evidence to substantiate her claims. *Id.*, at 924. The Court concluded that the plaintiff's testimony alone was sufficient to overcome summary judgment on the claim of excessive force and that the fact that the plaintiff failed to seek medical attention was not fatal to her claim.

Here, as in *Robinson,* Plaintiff's testimony that he was slammed into a wall several times until he passed out and was later assaulted at the precinct is sufficient to overcome summary judgment, even without any supporting medical evidence. Defendants' motion to dismiss Plaintiff's excessive force claims is, therefore, denied.

### Denial of Constitutional Right To Fair Trial

Defendants next move for summary judgment on Plaintiff's fifth cause of action, which alleges that Plaintiff was denied the right to a fair trial because Defendants suborned perjury from Rhone. "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in

an action for damages under 42 U.S.C. 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (citing cases). Falsified or fabricated evidence alone does not amount to a constitutional violation, however. The constitutional violation occurs when such evidence is admitted at trial and impairs the truth-seeking function of the court proceedings. As the Second Circuit has explained:

> We have not held that a suggestive identification alone is a constitutional violation; rather, the constitutional violation is that [the plaintiff's] right to a fair trial was impaired by the admission of testimony regarding the unreliable identification .... In the context of an identification following a police procedure that was impermissibly suggestive, the due process focus is principally on the fairness of the trial, rather than on the conduct of the police, for *a suggestive procedure does not itself intrude upon a constitutionally protected interest.*

*Wray v. City of New York*, 490 F.3d 189, 193 (2d Cir. 2007) (internal quotations and citations omitted) (emphasis in original).

The parties in this case do not dispute that Rhone did not testify at the criminal trial. Defendant's 56.1 Statement ¶ 85; Plaintiff's 56.1 Statement ¶ 85. Rhone was subpoenaed, but refused to testify. Weber's Ex. I at 298. Since Rhone did not testify at the criminal trial, his allegedly false and coerced statement could not have influenced the jury. Therefore, no harm resulted from the allegedly false and coerced statement and Plaintiff's right to a fair trial was not impaired on this account. Defendants' motion to dismiss Plaintiff's denial of fair trial claim, is therefore, granted.

### Qualified Immunity

Next, Defendants argue that they are entitled to qualified immunity. Because this Court has dismissed all claims except for the excessive force claims, the Court addresses Defendants' qualified immunity argument solely as it pertains to Plaintiff's fourth cause of action.

Officials are entitled to the qualified immunity defense "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir. 1995) (quoting *Harlow v. Fitzgerald*, 457 US 800, 818 (1982)). Qualified immunity is an affirmative defense that defendants have the burden of establishing upon a motion for summary judgment. *Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) (citing *Gomez v. Toledo*, 446 US 635, 640 (1980)). Summary judgment is properly granted where a defendant can show in the moving papers that "he could, as matter of law, reasonably have believed [his conduct] was lawful." *Blissett*, 66 F.3d at 538 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)) (alteration in the original). However, summary judgment should be denied where issues of material facts are in dispute. *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994).

Defendants have failed to show that their use of force against Plaintiff during the arrest or in the interrogation room at the precinct was lawful or that they as a matter of law reasonably believed that it was lawful. The extent of the force used is in dispute, and this Court cannot rule as a matter of law on the lawfulness of the force used or on whether detectives could have reasonably believed that the force used was lawful. Defendants, therefore, have not met their burden of establishing that they are entitled to summary judgment based on the qualified immunity defense.

### Plaintiff Fails To State A Claim Against Defendant City

Even though the individual Defendants have not established that they are entitled to qualified immunity on the excessive force claims, Defendant City of New York is entitled to summary judgment with respect to these claims. A plaintiff seeking to impose liability under

§ 1983 on a city for the acts of its employees must "plead and prove ... (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) denial of a constitutional right." *Zahra v. Town of Southhold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). Plaintiff, however, has failed to prove any of these elements. Indeed, Plaintiff's opposition papers make no effort to rebut Defendants' arguments seeking to dismiss the City. Accordingly, Defendants' motion to dismiss Plaintiff's claim against defendant City of New York is granted.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment dismissing Plaintiff's complaint is granted in part and denied in part. It is granted with respect to Plaintiff's first and second causes of action, alleging false arrest and malicious prosecution, respectively. Defendants' motion for summary judgment is also granted with respect to Plaintiff's fourth cause of action, alleging malicious abuse of process, and his fifth cause of action, alleging denial of a fair trial. In addition, Defendant City of New York's motion for summary judgment is granted, and the City of New York is dismissed from this action.

Defendants' motion for summary judgment is denied with respect to Plaintiff's third cause of action, alleging excessive force. Defendants have not established that the individual defendants are entitled to qualified immunity with respect to this claim.

SO ORDERED.

                              S/
                              SANDRA L. TOWNES
                              United States District Court

Dated: March 31, 2009
       Brooklyn, New York

22